## DI ·SALVO v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. October 18, 1924.)

No. 6545.

**I. Criminal law ☞347—Evidence in support of defense of entrapment held erroneously excluded.**

Where one of the defenses was entrapment, questions asked in cross-examination of a government witness, who was one of the parties to the alleged entrapment, as to what transpired between them prior thereto, were competent, and their exclusion was error.

**2. Criminal law ☞396(2)—Exclusion of evidence of conversation held error.**

Where government witnesses had testified to a conversation between defendant and a third person, which they overheard from a place of concealment, refusal to permit ·defendant to testify to the conversation, or that it was not on the subject testified to, *held* error.

**3. Criminal law ☞739(1)—Evidence held to require submission of issue of entrapment to jury.**

In a prosecution for illegal possession and sale of narcotic drugs, evidence tending to ˜show that defendant had not previously dealt in narcotics, that government agents sent a woman to him with money furnished by them, and that she solicited him to procure morphine for her, *held* sufficient to require submission of the issue of entrapment to the jury, and refusal to do so, and an instruction that there was· no evidence of entrapment, *held* error.

**4. Poisons ☞9 — Instructions in prosecution for violation of Narcotic Act held erroneous.**

The provisions of Anti-Narcotic Act, § 1, as amended by Act Feb. 24, 1919 (Comp. St. Ann., Supp. 1919, § 6287g), that· possession of narcotic drugs not bearing appropriate tax-paid stamps shall be prima facie evidence of unlawful purchase, and of section 8 of Anti-Narcotic Act (Comp. St. § 6287n), that possession by a person not registered shall be presumptive evidence of unlawful possession, raise presumptions of fact, not of law, and instructions to a jury that, if they found such possession by defendant, they should convict, *held* erroneous.

In Error to the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

Criminal prosecution by the United States against John Di Salvo. Judgment of conviction, and defendant brings error. Reversed and remanded.

David M. Proctor and William G. Lynch, both of Kansas City, Mo. (V. E. Phillips,

of Kansas City, Mo., on the brief), for plaintiff in error.

Charles C. Madison, U. S. Atty., and S. M. Carmean, Asst. U. S. Atty., both of Kansas City, Mo. (C. S. Walden, Asst. U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before SANBORN and LEWIS, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge. Plaintiff in error was convicted on three counts of an indictment charging him with violations of the Anti-Narcotic Act, 38 Stat. 785 as amended (Comp. St. §§ 6287g–6287q).

The first count appears to have been drawn under Section 8 of the Act, which provides:

"It shall be unlawful for any person not registered under the provisions of this Act, and who has not paid the special tax provided for by this Act, to have in his possession or under his control any of the aforesaid drugs; and such possession or control shall be presumptive evidence of a violation of this section, and also of a violation of the provisions of section 1 of this Act."

It charges that Di Salvo, on or about May 3, 1923, was a dealer in narcotic drugs at Kansas City, Missouri, that as such dealer he was required by law to register, that on that day at Kansas City, Missouri, he did unlawfully possess ten ounces of morphine without having registered as a dealer and without having paid the special tax as such dealer.

The second count appears to have been drawn under Section 2 of the Act, which provides:

"It shall be unlawful for any person to sell, barter, exchange, or give away any of the aforesaid drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Commissioner of Internal Revenue."

It charges that on or about May 3, 1923, Di Salvo, at Kansas City, Missouri, did unlawfully sell ten ounces of morphine to a certain person, to wit, one ———.

The third count appears to have been drawn under Section 1 of the original Act as amended by the Act of February 24, 1919 (40 Stat. 1130, 1131 [Comp. St. Ann. Supp. 1919, § 6287g]), which provides:

"It shall be unlawful for any person to purchase, sell, dispense, or distribute any of the aforesaid drugs except in the original stamped package or from the original stamped package; and the absence of appropriate tax-paid stamps from any of the aforesaid drugs shall be prima facie evidence of a violation of this section by the person in whose possession same may be found."

It charges that on or about May 3, 1923, Di Salvo, at Kansas City, Missouri, did unlawfully purchase from a person or persons to the grand jurors unknown, ten ounces of morphine, the same not being in or from the original stamped package.

The case for the prosecution rested principally upon the testimony of narcotic agents Sheets and Bradshaw, McDonald, who was a city employé and co-operated with the narcotic agents, and Greeson, narcotic agent in charge at Kansas City. The alleged sale, charged in the second count, was made to Mrs. Grace Wittman at the Cordova Hotel in Kansas City on May 3d. The charges of unlawful possession and purchase, made in the other counts, find support only in what occurred at the sale. Aside from that there is no direct and independent proof of either. On May 2d Mrs. Wittman, whose husband was then under arrest and in jail for violation of this statute, went to the office of Mr. Greeson in the Federal Building in Kansas City and had an interview with witnesses Sheets and McDonald. Sheets testified that she told them that she would be buying some stuff from Di Salvo, and they told her that if she could make a buy they would furnish the money. She came back to them the next day and said she had made the arrangements. McDonald testified that the conversation on May 2d with Mrs. Wittman was a sort of a preliminary; that they did not know then whether it would materialize or not. She told him and Greeson that she could make a buy from some prominent people and they told her to go out and if she could make arrangements they would furnish the money. They told her if she could make the arrangements, to come back the following morning, and on the following morning she came back and told them that she had made the arrangements. McDonald then told Greeson about it and Greeson got $250 with which to make the purchase. The $250 was marked by McDonald and Sheets for identification. Bradshaw testified that when they were marking the money they said, "We had an opportunity to make a buy off of Di Salvo of morphine," and that they were going to use the marked money to make the buy. They had never discussed Di Salvo before. About 1:30 p. m. on May 3d Sheets, Bradshaw and McDonald went

with Mrs. Wittman to the Cordova Hotel. Bradshaw remained below to watch and the others went up to Room 516. They borrowed two grips in the hotel office and took them up to make it look like Mrs. Wittman was stopping there. Mrs. Wittman was not a witness at the trial and her whereabouts at that time appears to have been unknown. Sheets and McDonald testified that after they had gotten to the room Mrs. Wittman called Di Salvo over the telephone and told him she had the money and asked him to come there. McDonald said that he and Sheets stood by Mrs. Wittman when she telephoned Di Salvo, and that she said: "John, you know that deal I was talking to you about yesterday? I want ten ounces of that stuff. I have the money." The money was put in the dresser drawer by McDonald and he instructed Mrs. Wittman not to bother the money, that when she touched the money that was a signal that Di Salvo had come with the morphine. Sheets and McDonald then secreted themselves in the bath room, after they had made two small peepholes in the door. Presently Di Salvo came into the room. He had no narcotics with him. Sheets and McDonald testified that Di Salvo and Mrs. Wittman discussed payment for the narcotics, that Di Salvo first wanted immediately all of the money, then a part of it, but none of it was given to him at that time by Mrs. Wittman and he left the room. Sheets and McDonald then came out of the bath room. Apparently the transaction had fallen through. Sheets and McDonald then gave to Mrs. Wittman a receipt and $50 of the $250, and told her to go and get Di Salvo to sign the receipt and pay him the $50. McDonald told her to see if he would accept $50, and the other $200 when he brought the stuff. She seems to have overtaken Di Salvo on the street, got in his automobile and rode around with him a while and came back with the receipt signed by Di Salvo. The receipt was introduced in evidence. It was signed by Di Salvo and acknowledged receipt of $50 from Mrs. Wittman "for payment ten oz. of morphine," as of date May 2d. Di Salvo admitted that he signed the receipt and got the $50 from Mrs. Wittman while in the automobile, but he testified that he could only sign his name and could not read or write English. In this he was amply corroborated. No more of the money was paid to him. He further testified that about ten days previously he met Mrs. Wittman at a restaurant at her request, when she solicited him as bondsman for her husband, that she was to secure him and a friend of his if they decided to sign the bond, and that he understood from her that the $50 was given as part security. After Mrs. Wittman returned to the room in the hotel with the receipt she and Sheets and McDonald remained there until about 5 o'clock, when, as they testified, Di Salvo returned with a sack and placed it on the dresser. They saw him do that through the peep-holes in the door. The sack contained ten unstamped one-ounce boxes of morphine. Thereupon Sheets and McDonald came from the bath room and arrested Di Salvo. Mrs. Wittman left the hotel immediately. Up to that time she was constantly under the control and acted at direction of the government's agents, and the purchase from Di Salvo, if made, comes dangerously near being their purchase. The woman seems to have been their puppet. The narcotic agent also testified that after Di Salvo's arrest he said the stuff was not his, that he just went and got it for the woman and that that was the first time he had ever done anything of that kind. Di Salvo denied when on the witness stand that he took the morphine to the room in the hotel. He testified that Mrs. Wittman had asked him and a friend about a week before to sign her husband's bond, that she called him over the telephone to come to her room concerning that matter, that after he had left she came down on the street, paid him the $50 on that account, that he was to go and see his friend and come back and get $200 more if that proved to be satisfactory to his friend.

[1] In several respects we think the court erred in the exclusion of evidence, both on cross-examination of the government's witnesses and also on examination in chief of the defendant. One of the defenses was entrapment, and it was important and competent on that question to find out all that had transpired between Mrs. Wittman and Sheets and McDonald when she went to the Federal Building on May 2d. When Sheets was being cross-examined on that subject this occurred:

"Q. In connection with what matter, did she come to your office?

"Mr. Coon: And to that we object as not having any bearing upon this case. Immaterial.

"The Court: Objection sustained.

"Q. How long was she there on that day?

"Mr. Coon: And to that, the same objection.

"The Court: Objection sustained."

It appears that the Government agents knew where Mrs. Wittman was then living and very shortly after the arrest of Di Salvo they went there.

McDonald and Sheets each testified that the peep-holes through the bath room door were each about the size of a match. Sheets said that he had a match and ran it through the hole and knew it was of that size. Counsel for defendant questioned whether they could see Di Salvo through these holes, and what he did and what he had with him. He perforated with a match several sheets of paper, handed it to witness Sheets and asked him to look through it and tell the jury what he could see "at the distance that the reporter is from you." The district attorney objected on the ground that the test was incomplete, unfair to the witness and not made under like conditions and with like materials that the original was made by the witness, that "The only thing in this is the size of the hole. Now, this hole is the size through which he said he saw. We don't have the identical room or the identical door." The court sustained the objection. McDonald and Sheets testified to the calling of Di Salvo over the telephone by Mrs. Wittman when they went to the room in the hotel, and to the conversation between her and Di Salvo. When Di Salvo was on the witness stand and was being examined by his counsel this occurred in reference to that conversation:

"Q. Did you know where she (Mrs. Wittman) was?

"A. She told me.

"Q. What did you do when you heard from her?

"A. Well, I asked her what she wanted.

"Mr. Coon: Now we object to what she asked.

"The Court: The objection will be sustained and the answer stricken out."

[2] Di Salvo was then asked about what occurred after he entered the room at the hotel the first time, and this occurred:

"Q. What did you talk about?

"Mr. Coon: Object to that as immaterial.

"The Court: Objection sustained."

The Government's witnesses had testified fully as to this conversation. Then after some discussion by counsel the court ruled that the defendant could "testify to any matters the Government brought out." That is to say, if we correctly understand what followed, the defendant was permitted to testify only as to what conversation if any he had with Mrs. Wittman about selling

2 F.(2d)—15

morphine to her. He testified that he had no conversation on that subject. His claim was that he went there on an entirely different mission. He was then asked by his counsel:

"Q. Did you talk to her about the selling of any morphine?

"A. No sir.

"Mr. Madison: Just a moment. We object to that as leading and for the further reason it calls for testimony that doesn't tend to refute the Government's testimony. It calls for conversation. It calls for his conclusion as to what the conversation was.

"The Court: Objection sustained."

It is apparent that it was the defendant's claim that the conversation he had there was about signing the bond of Mrs. Wittman's husband, and it was competent in refutation of the testimony for the prosecution. On objection of the district attorney the defendant was not permitted to testify that he did not fill out the receipt. He did testify that Mrs. Wittman did not do that, and thereupon, on motion the court struck that testimony. It was material under the other circumstances in the case on the defense of entrapment, whether the Government agents filled out this receipt. To some of the rulings above noted no exceptions were taken. Some of these claims of the defendant thus exhibited by the questions may have seemed wholly improbable and unreasonable to the court, but the determination of their truthfulness or falsity was for the jury.

[3] On the facts that are disclosed we think it cannot be conclusively said as matter of law that the representatives of the Government stopped with setting a decoy for a suspected law-breaker, and only stood by while he fell into the trap. There was evidence tending to show that the defendant had never theretofore dealt in narcotics, that the officers participated in devising the criminal act, aided Mrs. Wittman in inducing it, and sent her after the defendant with money and the beguiling pleas of a woman's tongue when he had dropped out of the proposed deal and was about to escape. This with the other circumstances raised an issue of fact to be passed on only by the jury, and it was error to refuse the defendant's request to instruct the jury on that subject, either in such appropriate terms as the court might select or in the language of the request:

"It is never permissible for the Government through its officers or agents to initiate the criminal act, nor to entice or induce a defendant to commit a crime, when with-

out such entixement or inducement the defendant would not have committed such crime. A defendant cannot be convicted of a crime which was provoked or induced by a Government agent or officer and which would not otherwise have been committed." Butts v. United States (C. C. A.) 273 F. 35.

To the court's refusal to so instruct an exception was saved. Not only did the court instruct the jury that there was no evidence of entrapment, but it held up the defendant before the jury by the side of Judas Iscariot. In this connection the court said to the jury:

"Sometimes jurors are influenced by the fact that the Government procures some individual to make a purchase from the defendant, as in this case, and the jurors may believe that this is taking an unfair advantage of the defendant. . The court charges you that that was a perfectly legitimate practice.

"All of you recall the beautiful story that Jesus of Nazareth gave to the world when He was here, and you recall the tragedy of His crucifixion, when on the last night before His crucifixion He knew that He was going to be betrayed. He went down to Jerusalem; told His followers that He would be betrayed, and so went to Jerusalem and told them further that He would be crucified. It may be argued that by going to Jerusalem He tempted Judas Iscariot; that He could have remained away and saved Judas Iscariot from committing the despicable crime he did commit in betraying his Master. The Bible story is that when Jesus was with His disciples on the last evening of His most eventful life, that Judas Iscariot was with Him; that he had accompanied Him in the three years of his ministry; and that in a room while He was alone with His disciples, that Jesus told His disciples that He would be betrayed, and more than that, He said, 'I will be betrayed by one of your number.' He turned to Judas and said, 'What thou doest go and do quickly.' That was the substance of what He said to him. It might be said that Jesus was urging him to go and commit a crime, the greatest crime that is known to man. But, it was in the heart of this man. It was really giving him the opportunity to commit crime if he was disposed to commit the crime.

"So, these officers, in going there with Mrs. Wittman and having her call this man to the room at 516 Cordova Hotel, were only giving this man an opportunity to commit crime if he were disposed to commit a crime,

and there was no method whereby they could detect men who were violating that Act. So, gentlemen of the jury, in this case the court must charge you that there was no entrapment in the case."

The illustration is incongruous, but it is not believed that any jury could act without passion and prejudice in such an atmosphere. The court seems to have felt that the Government's agents were subject to criticism and to have been solicitous that the jury should not look critically upon them for using Mrs. Wittman. After telling the jury that defendant had met Mrs. Wittman on a former occasion in a restaurant in the city and had had a conversation with her there, the court then argumentatively said:

"So, gentlemen, if the defendant was willing to deal with Mrs. Wittman, no just criticism could be passed upon the narcotic agents because they were using the services of the same woman."

What has been said is applicable to all three counts and requires a reversal as to each.

[4] We also think the specific instructions on counts one and three were erroneous. As to count one the jury was instructed:

"Now, gentlemen, the rule is that a dealer—that any person with a quantity of morphine as great as has been exhibited to you, ten ounces, for instance—is presumed, as a matter of law, to be a dealer. He is a dealer, regardless of any registration or anything else. If he has that quantity of morphine in his hands he is presumed to be a dealer, and then, gentlemen, if he is in possession—if any person being a dealer as based upon such presumption, because of his possession, if he is in possession of such narcotics without being registered, then he is a violator of the law. It isn't incumbent upon the Government to show that he has registered, but the burden is upon him, and in the absence of any showing, if you find that he was actually in possession of these narcotics covered by the testimony, it is your duty to convict him under the first count of the indictment as having been in possession of narcotics in violation of the law."

As to the third count the jury was instructed:

"Now, gentlemen, it is unlawful under this law for any person to make a purchase of morphine such as is mentioned, covered by this case, unless such persons make such purchase either in the original containers with the stamp of the Government upon it, or from the original containers with stamp of the Government upon it; and this indict-

ment charges that the defendant in this case made such purchase of morphine without such purchase having been made either in or from the containers containing the stamp of the United States Government. And, gentlemen, I may say here that it is sufficient to justify conviction upon that indictment if any person is found in possession of the quantity of morphine named and mentioned in the testimony here, because the law presumes that such person did make the purchase, and it is not necessary for the Government to produce any further testimony."

Reverting later to the first count, the court again said to the jury:

"The very possession of them (narcotics), the court charges you, is a violation of the law, and you need not go any further so far as the testimony on the first count is concerned."

And reverting later to the third count, the court charged the jury:

"The very fact, gentlemen, if you find in this case that he was in possession of the ten ounces of morphine exhibited to you, then, gentlemen, you don't have to go any further. Under the circumstances, you should return a verdict of guilty under the third count of the indictment, for the law is that no person has a right to make a purchase of morphine under the circumstances of this case, unless such person not only be registered in order that he may be qualified to make a purchase and must make it upon a form presented, prepared and supplied him by the Government, and then such purchase can only be made in the original containers containing the stamp of the Government or it must be made from the original containers containing the tax-paid stamp of the Government; and unless it was made under such circumstances, it was an unlawful purchase, and the very possession of that quantity of narcotics presumes that the purchase was made, so it is not necessary to go any further. If you find that he was in possession of these narcotics on that day, then it is your duty to return a verdict of guilty as having made an unlawful purchase of narcotics at that time."

We are not able to reconcile the instruction of the court as to the first count with what is said by the Supreme Court in United States v. Jin Fuey Moy, 241 U. S. 394, 36 S. Ct. 658, 60 L. Ed. 1061, Ann. Cas. 1917D, 854, nor as to the third count with what is said in United States v. Wong Sing, 260 U. S. 18, 43 S. Ct. 7, 67 L. Ed. 105, and as to both counts we think there was error, because the court treated possession as a pre-

sumption of law requiring conviction on the first count, while it also treated the absence of stamps on the packages as a presumption of law that the defendant had unlawfully purchased the morphine, and directed the jury to convict on the third count on that presumption. The statute says that possession is presumptive evidence of unlawful possession and that the absence of stamps is prima facie evidence of unlawful purchase, that is, they are presumptions of fact. As to each count the presumption on the facts stated, unexplained, would support a verdict of guilty; but they are only presumptions of fact and not presumptions of law. They should have been considered by the jury only as facts for the purpose of determining whether defendant's possession was unlawful as charged, and whether he had unlawfully purchased the drugs as charged, but the jury left free to find either way; like the presumption of fact that one in the possession of chattels recently stolen is the thief, from which the jury must be left at liberty to convict or acquit, as its judgment may dictate. Here they seem to have been treated as presumptions of law absolute, like the presumption created by the Statute of Limitations against a suit on a note, conclusive of payment,—here conclusive of guilt.

Reversed and remanded.