556

## SHERMAN v. UNITED STATES.

### Nos. 150–153.

Municipal Court of Appeals for the
District of Columbia.

March 16, 1944.

J. E. Bindeman, of Washington, D. C., for appellant.

John P. Burke, Asst. U.S. Atty., of Washington, D.C. (Edward M. Curran, U.S. Atty., Cecil R. Heflin, Asst. U.S. Atty., and John L. Laskey, District Enforcement Atty., Office of Price Administration, all of Washington, D.C., on the brief), for appellee.

Before RICHARDSON, Chief Judge, and CAYTON and HOOD, Associate Judges.

RICHARDSON, Chief Judge.

Four informations were filed, each charging defendant with a separate violation of the maximum ceiling price for potatoes established by the Administrator of the Office of Price Administration under Section 2 of the Emergency Price Control Act of January 30, 1942.[1] It was alleged that the sales were knowingly, willfully and unlawfully made by defendant of an aggregate of 1100 pounds of potatoes at $.07½ per pound, a rate in excess of the maximum ceiling price of $.054 per pound.

After a jury trial defendant was found guilty as charged.

A motion for new trial was denied and sentence imposed in each case. Appeals were taken and the cases were consolidated for hearing in this court.

Numerous errors have been assigned, requiring consideration of voluminous evidence. This we summarize briefly in the sequence of events.

Defendant claimed to have been engaged exclusively in the wholesale vegetable business, operating one truck, purchasing at wholesale from local markets and elsewhere, and selling to retail stores and purchasers. He had no place of business other than his home and his truck. He was unable to estimate the volume of his business and only made trips with his truck when he felt like working.

---

[1] Public Law 421, 77th Congress, 2d Session, 56 Stat. 23, 50 U.S.C.A.Appendix § 902.

Defendant's wife, it was claimed, owned and operated a retail store for the sale of vegetables, meats and groceries. She purchased her vegetables from defendant at a profit to him. Her meats were purchased for her by defendant and delivered in his truck, for which service he made no charge.

Defendant and his wife testified that on Monday, May 17, 1943, they discussed the matter of securing potatoes. She telephoned the Office of Price Administration and talked to one Stanton. She testified that she told him she could purchase potatoes for a price between $5.50 and $6.00 per hundred pounds, and asked what her retail price would be; that he told her it would be $.07½ per pound. Stanton testified that he had no recollection of her inquiry; that she may or may not have called as there were many inquiries by telephone, but that he could not have given the retail price on potatoes without knowing the class of store, the cost of potatoes to the wholesaler, and the place where the latter were purchased, which would determine the freight rate, an essential element in ascertaining the ceiling price.

Defendant testified that on the following morning, Tuesday, he left in his truck, with his sixteen year old son, with the object of purchasing a load of potatoes. About 2 o'clock that night, he stopped for gasoline at a place in South Carolina, the name of which he did not know. A man with a truck load of potatoes in one hundred pound sacks drove up and this man offered to sell the potatoes for $3.50 per sack. Defendant purchased the entire lot, two hundred sacks, for $700, paying cash and taking no receipt. Defendant testified that he did not know the identity or the name of the man, had never seen him before, did not know where the potatoes came from except that he was told they came from Edisto Island, South Carolina, which was about sixty-five miles from the place where he made the purchase.

During that night the potatoes were transferred from one truck to the other, and in the morning defendant started on his return to Washington, arriving and parking his truck in front of his wife's store Friday morning at about 10:30.

At about 11:30 one Miller, an inspector for the local branch of the Office of Price Administration, saw the truck in front of the store. He stopped and inquired of defendant whose truck it was and was told that it belonged to defendant. He asked whose potatoes they were and defendant answered that they were his. He then asked at what price they were being sold and defendant's wife said: "at 7½¢ per pound." Miller told them to stop selling until he could determine the proper price. It was admitted that sales at $.07½ had been made, but from the inspector's arrival until approximately one o'clock no further sales were made.

Miller testified that he was told by defendant that he had paid $3.50 per hundred pounds but had no receipt, and that he said to him that he would have to accept his statement in computing the selling price. It was undisputed that he had several conversations with defendant's wife between the time of his arrival and one o'clock, and that she claimed that she had purchased the potatoes from her husband for $5.50 per hundred pounds; that she had given defendant $1100 in cash; and that she was entitled to sell at retail for $.07½ per pound, and had been so advised by Mr. Stanton.

Miller testified that he figured the proper price after telephoning and ascertaining the freight from Edisto Island to Washington, D.C., and that this, plus the stated cost of $3.50 per hundred, plus the one-third mark-up allowed under the regulation, made the maximum ceiling price of $5.40.

A number of customers were waiting to purchase potatoes. Defendant's wife testified that at one o'clock, after Miller had again telephoned, she asked him whether she could sell the potatoes and he said she could; that she asked him at what price and that he said $.07½. This was denied by Miller who testified that he said the price was to be $5.40. There was other testimony on the subject but, as it was for the jury to determine what was said, it need not be considered. Immediately following this telephone call and discussion, sales of potatoes were made, those on which the charges were based being from the parked truck in one hundred pound sacks. One sale of one hundred pounds was made by defendant. Whether the remaining three sales covered by the charges were made by defendant personally or by his son was disputed. All sales were made at the $7.50 rate.

While these sales were occurring, the inspector listed the names, automobile

license numbers, and the amount sold to each of the four purchasers. Defendant's wife testified that she noticed the inspector outside taking notes; that she asked him what he was doing and whether he intended to make trouble. He said he did not and she then said to him—"If we are going to have any trouble I would rather take my potatoes and dump them, dump them out, because I am not looking for any trouble." The inspector did not recall such a statement.

Defendant introduced evidence to show that the store was operated by Mrs. Sherman; that she was in active charge of it, employing one assistant, a colored girl. The licenses and other documents indicating ownership were in her name. She testified that she had a bank account and kept her own books, and while her husband purchased the meat for her without compensation and spent a little time helping in the store, he had no interest in it. She purchased her vegetables from him.

Defendant was cross-examined in regard to his wholesale business. He said that he had no other business, and operated but the one truck; that he supported his wife, and employed his sixteen year old son, paying him a salary of $35 per week. He also stated that he had paid him $50, in addition to his salary, for making the trip on which these potatoes were purchased, and paid the expenses of the trip. He stated that while he kept books he did not enter cash purchases. At one point he testified that he did not enter sales where purchases were for cash, but later stated the reverse. He kept no bank account. He testified that when his wife paid him the $1100 for the potatoes he did not make a record of it; that no receipt was given; that it was paid in cash and he put the money in his pocket. Defendant admitted that there was no entry of the transaction of purchase or sale in his books. He stated that he did not make entries in his books, but that this was done by a man whose name he could not recall. He said there were several books and when he was asked if he could get them, said that they were at home and he could not get them at the time. When asked if he could get them if he was excused he said that they were kept at several places and he would have to look for them. He could not recall the extent of his business when questioned about the amount of monthly or yearly gross business. He stated that he did file a separate income tax return with the Federal Government and with the District Government, but could not recall any amounts.

We have recited a part only of his evidence which throughout his cross-examination was in many respects evasive and implausible.

There was undisputed evidence that, conceding the potatoes were purchased at Edisto Island for $3.50 per hundred pounds, the maximum price defendant could charge was $5.40 per hundred; and that if there was a resale by defendant to his wife at $5.50, the maximum ceiling price on sales by her would be $7.34 per hundred.

The court charged the jury, in effect, that there were two theories upon which the prosecution relied: First, that the potatoes were the property of the defendant when the sales complained of were made. If they so found, it was for them to decide whether defendant, or others in his behalf, sold them in excess of the ceiling price; that if they found that he made an honest, sincere and diligent effort to ascertain the lawful retail price, or had knowledge of such inquiry made in his behalf, and sold the potatoes in the innocent belief he was complying with the requirments of the law, he would not be guilty. Second, that the jury might find that the potatoes were in fact resold to and were the property of defendant's wife, and, if so, they should decide whether he participated as an accessory with her in the sales at a price in excess of the maximum ceiling. It then instructed that defendant should be found not guilty if the jury found that he sold potatoes for his wife under the honestly mistaken impression he was complying with the law.

The court further charged that in considering the question of good faith and honest intent their attention would naturally be directed to many phases of the testimony. That it was for them to say whether or not they believed that defendant's wife made the telephone call to Stanton, and what information was obtained; what was said by Miller to defendant and his wife at the store on May 21st, and what took place on that occasion. He also charged them that they should examine the business relationship between defendant and his wife in the light of the evidence submitted at the trial and refrain from speculation; that it should not be condemned on the sole ground that its exist-

ence in the business world is unusual or infrequent.

The part of the charge thus summarized was prepared by the court, submitted to and approved by counsel. The remainder consisted of the specific instructions granted pursuant to requests.

The court refused to grant a prayer submitted by defendant on the theory of entrapment. This, with other error assigned, will be discussed in the order presented in appellant's brief.

While there are eleven assignments of error, certain of these involve substantially the same questions. Defendant has presented his argument under seven titles which fairly state the issues on the appeal, which we will follow in their order in this opinion.

I. Proof of Defendant's Connection with the Sales on which the Prosecution was Based.

■ Defendant admitted that he personally made one of these sales. Although the inspector's testimony that he made the other three sales was strongly contradicted the record affords a substantial basis for the jury's findings. It may have considered the alleged resale by defendant to his wife as a mere subterfuge; it may have disbelieved the unsupported testimony of defendant and his wife that such a sale occurred, and decided that defendant was a principal in the transaction. He had informed the inspector, on the latter's arrival, that the potatoes were his. His evasive excuses for failure or inability to produce his books; his admission that neither the purchase of the potatoes nor the sale to his wife had been entered in his books; the supposed payment in cash; the failure to give or his wife to request a receipt, were circumstances casting a cloud of suspicion on the transaction. The wife testified she had a bank account and kept books of accounts of the store business, but her books were not produced. The jury was entitled to draw the usual inferences from the failure to produce these records.

Defendant's sixteen year old son, who defendant claims made the remaining three sales, was employed by him and was not employed by the wife. This son was not called as a witness. Whether the jury believed that defendant made the sales personally, or that they were made by his son

in his presence and impliedly under his direction, was immaterial.

II. Approval by the Secretary of Agriculture of the Price Ceiling Regulation.

Section 3(e) of the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A. Appendix § 903(e), provides that:

"No action shall be taken under this Act by the Administrator or any other person with respect to any agricultural commodity without the prior approval of the Secretary of Agriculture; except that the Administrator may take such action as may be necessary under section 202 and section 205(a) and (b) (sections 922 and 925 (a), (b), of this Appendix) to enforce compliance with any regulation, order, price schedule or other requirement with respect to an agricultural commodity which has been previously approved by the Secretary of Agriculture."

The maximum retail ceiling price on potatoes was fixed by Regulation 268 as originally issued by the Administrator of the Office of Price Control, November 7, 1942. When published, November 10, 1942 (7 Federal Register 9184), an endorsement of the Secretary of Agriculture, reciting his approval, was appended. The regulation was thereafter amended with the Secretary's approval, but we find no amendment affecting in any way the maximum price ceiling of potatoes, or having any bearing upon the present case. On May 10, 1943, Revised Maximum Price Regulation No. 268 was issued (8 Federal Register 6129). It recites that:

"Maximum Price Regulation No. 268 is re-designated Revised Maximum Price Regulation No. 268 and is amended to read as follows: * * *."

Again the pertinent provision for determining the maximum price of potatoes remained unchanged.

The revision as published did not bear an endorsement of the Secretary of Agriculture. Evidence of his approval was not offered at the trial.

■ Unquestionably a regulation affecting an agricultural commodity, therefore within the restrictions on the powers of the Administrator imposed by Section 3(e) of the Price Control Act, may not be validly issued by the Administrator without approval of the Secretary of Agriculture. Whether this question of validity

may be raised in the defense of a criminal action for violation of the regulation, has not been settled by authoritative judicial decision.[2] But here, if we assume the invalidity of the revised regulation, the original, as theretofore amended, remained in full force and effect. United States v. Armour & Co. of Delaware, D.C. Mass., 50 F.Supp. 347.

As the original regulation fixing the price ceiling was approved by the Secretary of Agriculture, and the price so fixed remained unchanged in the subsequent amendment and revision of the regulation, we hold that it was binding upon the defendant.

It is claimed, however, that it was error for the prosecution to fail to plead and offer proof of the approval of this regulation by the Secretary of Agriculture. The informations charged that sales made by the defendant were in violation of maximum ceiling price Regulation No. 268, as amended. (We note that the amendment of January 6, 1943, which we regard as immaterial because it did not affect any pertinent part of the regulation, was approved by the Secretary of Agriculture as shown by his endorsement at the foot of the published copy). We hold that the regulation was properly pleaded without a recital of its approval.

The record shows that the regulation, probably a published copy, was handed to the court by·counsel during the progress of the trial. We think this was sufficient. Although the record does not identify the particular document delivered to the court, and it is not contained in the record either in the trial court or in this court, the adoption of the regulations and the existence of official acts necessary to their validity is a subject of judicial notice. Thornton v. United States, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013.

III. Refusal to Grant A Mistrial Because of Prejudicial Newspaper Publicity.

At the commencement of the second day of the trial, the court's attention was called to the fact that certain Washington newspapers contained articles relating to the case, that two of the jurors had copies of a newspaper containing such an article, and one juror had been seen reading one of these papers. We assume, without deciding, that the article in this paper was prejudicial to defendant's case. The jury was questioned by the court. Two jurors admitted that they had read the headline but stated that they had not read the article. This headline was: "OPA Spud Price Case Hinges On Technicality." The court then further questioned the jurors to ascertain whether any discussion had occurred among them as to the publicity given the case or whether any friends or relatives had discussed it with any of them. No affirmative answer resulting, the court overruled the motion for a mistrial. It then admonished them that they were not to take into consideration any matters outside of the testimony offered in the case, and in charging the jury at the conclusion of the trial repeated this admonition. Meanwhile counsel for defendant had requested the court to further question the jurors on this subject when they assembled on an intervening trial day, which the court refused.

The granting of a mistrial under these circumstances is a matter resting in the sound discretion of the trial judge. Welch v. United States, 77 U.S.App.D.C. 317, 135 F.2d 465, certiorari denied 319 U.S. 769, 63 S.Ct. 1329, 87 L.Ed. 1718. The result of the court's questions, we think, justified it in believing that no juror had read the article, and that but two jurors had read the headline. The statement contained in the title of the news item, read by two members of the jury, would not justify a mistrial.

IV. Granting of Instruction that if the Jury Believes that the Potatoes were Sold at a Price of $7.50 Per Hundredweight they are to Regard as Proven for the Purposes of this Case that the Sales were in Excess of the Lawful Maximum Price.

Under Regulation 268 four factors determine the maximum retail price of potatoes: (1) cost to the wholesaler, (2) the freight rate from point of origin, (3) a mark-up of one-third for wholesaler's gross profit, and (4) a like mark-up by the retailer on the wholesale price, allowed

[2] Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339; see also Rottenberg v. United States, 1 Cir., 137 F.2d 850, certiorari granted 64 S.Ct. 190, affirmed 64 S.Ct. 660, and Payne v. Griffin, D.C.Ga., 51 F.Supp. 588.

562

to stores having the highest preferred rating.

The price paid and point of origin, and the volume of business which gave the store the preferred rating, were established by defendant's evidence. The freight rate was proven, and not controverted. The resulting retail price was a matter of exact mathematical computation. Had defendant's wife paid him $5.50 per one hundred pounds, an amount in excess of the authorized wholesale price, the retail price of $7.50 would nevertheless have exceeded her cost plus her authorized profit.

It was proper and expedient for the court to inform the jury, as it did, that if they believed from the evidence that the potatoes were sold by defendant at $7.50 per hundredweight it was "to regard as proven for the purpose of this case the fact that potatoes were sold at a price in excess of the lawful maximum price, whether the defendant sold the potatoes as a retailer in his own right or as agent for his wife."

Defendant objects that by the use of this language, without reference to the fact that sales must be "willful" to justify a conviction under the statute, the jury may have been misled.

"It is axiomatic that the charge to the jury must be considered as a whole." Kinard v. United States, 69 App.D.C. 322, 101 F.2d 246, 247.

There were two component elements of the offense charged—a sale at a sum in excess of the lawful price and that the sale was made "willfully". Here the court was dealing with the one element—the sale in excess of the lawful price. Other parts of the charge instructed the jury that his acts must have been "willful" and explained the term as used in the statute. We think this was sufficient.

V. Objection to Government's Instruction No. III.

 This instruction was as follows:

"If you find and believe that any of the potatoes here in question were sold at retail knowingly and wilfully in disregard of the applicable regulations, and in so doing the defendant acted in bad faith, then he is responsible for his violations of such regulations."

The objection is that under the language used the jury could believe that defendant was responsible if anyone sold the potatoes in disregard of the regulations. The concluding part of the instruction made it clear that the statement immediately preceding applied only to defendant.

VI. Refusal of Instruction on Entrapment.

Defendant submitted an instruction on the subject of entrapment. It was denied and this, he claimed, was prejudicial error. The proposed prayer was as follows:

"The jury is instructed that if they find from the evidence that the witness, Marshall Miller, induced the defendant to violate the law, the defendant, not having in his mind, at that time, and having no intention to commit a crime or violate the law, then that is entrapment and you cannot punish the defendant for doing the things charged in the information, because that would be contrary to our public policy.

"If you have a reasonable doubt as to whether or not this defendant was entrapped into doing the thing that he did—then it is your duty to return a verdict of not guilty."

The court in its charge to the jury, to which no exception was taken, presented two theories for consideration. The first was whether the potatoes involved in the sales upon which the charges were based were the property of the defendant. As to this, the court instructed the jury that if defendant made an honest effort to ascertain the lawful price at which the potatoes could be sold at retail, or had knowledge of such inquiry and made the sales in the innocent belief that he complied with the requirements of the law, he would be acting in good faith, would not be guilty of knowingly, willfully and unlawfully selling in excess of the ceiling price, and the verdict should be not guilty. The second assumed that the jury would find that defendant had sold the potatoes to his wife at wholesale and participated in the retail resale as an accessory. In its instructions as to this second theory of the case, the court said:

"Your verdict should be not guilty if you find the defendant sold potatoes for his wife under the honestly mistaken impression he was complying with the law."

 We might justify the refusal of the instruction because it omitted the usual and essential element distinguishing illegal from legal entrapment—that the accused had not been engaged in making

unlawful sales prior to the arrival of the officer. The difficulty in obtaining evidence of law violations has in many cases excused flagrant misrepresentation and deception on the part of officers of the law when employed to secure evidence against persons engaged in criminal acts, and many cases hold that a necessary element of entrapment is that the accused should not have been engaged in the commission of similar violations of the law, or, it is said in some cases, that the officer had no reasonable grounds for the belief that the accused was so engaged.[3]

In copying the proposed instruction from that approved in O'Brien v. United States, 7 Cir., 51 F.2d 674, 677, defendant's counsel omitted that part of the paragraph wherein, after the words "having no intention to commit a crime, or violate the law", the instruction in that case continued "and these prohibition officers not having had sufficient knowledge that they had been violating the law." The fact that the potatoes were being sold at a prohibited price when the officer arrived, probably explains why that portion of the instruction approved in the O'Brien case was omitted.

In another important respect the instruction was deficient. Defendant, and his wife, in his presence, had represented to the inspector that defendant had sold the potatoes to the wife, and that the sales at $7.50 were authorized because having bought and paid for them at the rate of $5.50 per hundred pounds her retail price was justified, and that she had been so informed by an officer, Mr. Stanton, of the Office of Price Administration. They so testified at the trial. Had the jury found that the inspector did approve the price charged, or that he told defendant he could sell at $7.50, his action was necessarily based on the facts so represented to him. If these statements were untrue, if the wife had not bought the potatoes as claimed, the retail ceiling price could not have exceeded $5.40.

One of the main issues at the trial was whether this alleged transaction between husband and wife did actually occur. As we have elsewhere stated, there was reason for grave doubt on that point. The jury were fully and carefully instructed thereon. If it was found that there had been no such sale, that the facts had been misrepresented to the inspector, no statement made or assurance given by him in reliance thereon would constitute a defense. No estoppel may be founded upon acts induced by misrepresentation.[4]

The defense of entrapment is drawn by analogy from the equitable doctrine of estoppel. In the O'Brien case the court said:

"It would seem that the natural and logical approach to this subject of entrapment must be through the application of the doctrine of estoppel. Individuals, in dealing with each other, are not permitted to assert rights or enforce remedies when their own acts induced another to commit the wrong out of which arose the right sought to be enforced. 'Estoppel is founded on morality and justice, and especially concerns conscience and equity.'

"We see no reason why the government should not be subjected to the same rule of conduct. Although it be a sovereign, it should not be permitted to adopt means which are condemned by the courts when practiced by its citizens. It may not be sued save with its consent, it is true, but if it comes into court, it is as a litigant.

3 In Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 212, 77 L.Ed. 413, 86 A.L.R. 249, the court said: "Artifice and stratagem may be employed to catch those engaged in criminal enterprises."
In Butts v. United States, 8 Cir., 273 F. 35, 38, 18 A.L.R. 143, the court said: "The defendant had never committed any such offense as the officers of the government arrested and prosecuted him for prior to the time when they induced him to do the acts disclosed by this testimony."
See also Woo Wai v. United States, 9 Cir., 223 F. 412; United States v. Reisenweber, 2 Cir., 288 F. 520; Di Salvo v. United States, 8 Cir., 2 F.2d 222; Vamvas v. United States, 5 Cir., 13 F.2d 347; Silk v. United States, 8 Cir., 16 F.2d 568; Jindra v. United States, 5 Cir., 69 F.2d 429.

4 "Since the doctrine of estoppel in pais is founded upon principles of morality and fair dealing and is available only for the protection of claims made in good faith, the party setting up an estoppel is himself bound to the exercise of good faith in the transaction * * *." 19 Am.Jur. "Estoppel", Sec. 86; Second National Bank v. Dyer, 126 Conn. 101, 9 A.2d 503; Whitesell v. Strickler, 167 Ind. 602, 78 N.E. 845, 119 Am.St.Rep. 524.

"If the conduct of one be unconscionable, if it be intentionally deceptive and designed to induce, and does induce another to do something which he would not otherwise have done, the wrongdoer is not and should not be permitted to profit thereby. This rule, widely invoked in civil actions, has been applied to the government in the prosecution of its criminal cases."

■ It may be claimed that if the request for instruction was inaccurately drafted, a duty was incumbent upon the court to give a proper instruction on the subject. While this may be required where the instruction is upon essential principles as to which it is the duty of the court to instruct the jury whether requested or not, there is no general duty to instruct in the absence of a proper request, and it is not incumbent upon the trial judge to recast or modify an erroneous or misleading requested instruction.[5]

We desire, however, to place our ruling upon what we regard as a more fundamental ground and one which the record indicates was the basis of the trial court's action in refusing the instruction.

■ Entrapment never exists as a defense unless the accused has been led to do a criminal act by the trickery or undue persuasion of an officer of the law. All of the elements of the crime must exist. In the absence of any essential element the reason for the rule does not exist and the defense may not be invoked. The doctrine is one resting on judicial decision, it is of comparatively recent origin, and arises out of an equitable concept of justice founded on public policy.[6] Where the act charged as an offense lacks an element which the law requires to render it criminal, an adequate defense is always present. Such cases do not call for and are not illustrations of entrapment although circumstances of entrapment may exist which would exonerate the defendant if otherwise guilty. In Sorrells v. United States, supra, in criticizing the opinion of the Circuit Court of Appeals which had included cases of this type as illustrating the classes of cases in which entrapment was a defense, the Supreme Court said:

"But these decisions applying accepted principles to particular offenses, do not reach, much less determine, the present question."

An examination of the cases cited as typical of the "decisions applying accepted principles to particular offenses" demonstrates that these cases were decided on the point that a complete crime had not been committed and that the doctrine of entrapment was not invoked or relied upon.[7]

■ Unquestionably, under ordinary circumstances, both defenses, if supported by evidence, should be submitted to the jury with proper instructions as to each. But here, if the premise of the proposed prayer had been found by the jury in defendant's favor, he was guilty of no criminal offense. In other words, if the jury found that the defendant had no intention to violate the law in selling potatoes at $7.50, whether that was because he was misled by the inspector, or by the information his wife had given him of the statement attributed to Stanton, or for any other reason inducing an honest belief on his part that the price charged was legal, he was not guilty of a "willful" violation of the law.[8] In such event no crime had

---

[5] George v. United States, 75 U.S.App. D.C. 197, 125 F.2d 559.

[6] In Voves v. United States, 7 Cir., 249 F. 191, 192, a case in which intent was not an element of the offense, the court said: "In a civil transaction between citizens such conduct as the jury might have found in this case would create an estoppel which would preclude a suit based upon the suppressed truth. Is our government of the superman type that releases the ruler from the obligations of honesty and fairness that are imposed upon the citizens? Is one's liberty or reputation as a law-abider to have less protection than his property? We are strongly of the view that sound public policy estops the government from asserting that an act which involves no criminal intent was voluntarily done when it originated in and was caused by the government agents' deception."

Many cases on entrapment are collected in annotations in 18 A.L.R. 146; 66 A.L.R. 478; 86 A.L.R. 263, and in 51 F.2d 678.

[7] See also People v. Jaffe, 185 N.Y. 497, 78 N.E. 169, 9 L.R.A.,N.S., 263, 7 Ann.Cas. 348.

[8] Bouvier defines "willful" as "intentional", 2 Bouv.Law Dict., Rawle's Third Revision, p. 3455; see also United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; United States v. Illinois Cent. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773; Hargrove v. United States, 5 Cir., 67 F.2d 820, 90 A.L.R. 1276; Townsend v. United States, 68

been committed by him and the doctrine of estoppel or entrapment was not applicable and should not have been submitted to the jury; and if the jury found the premise untrue, his plea would be futile.

■ To add to the court's charge as given—that defendant should be acquitted if the jury found that he acted in good faith and in the belief that he was complying with the law—a further charge that if the jury found that Miller "induced defendant to violate the law," defendant having then "no intention to commit a crime or violate the law," the doctrine of entrapment would apply, would serve only to confuse the jury, to needlessly complicate the single, simple issue which was decisive of the case: Did defendant willfully and intentionally violate the law in making the four sales?[9] An examination of many cases indicates that the rule against entrapment has not been applied where the good faith or innocent intent of the accused is a defense. Where, as here, the violation of the law must be willful to constitute a crime, it is not necessary to appeal to rules of public policy to prevent a conviction which is impossible under the statute defining the crime.

## VII. Claim that Evidence of Other Crimes was Introduced by the Prosecution.

■ In support of this charge defendant refers to questions propounded in cross-examination of the defendant as to the sale to his wife at $5.50 per hundred pounds. Defendant's counsel has quoted from the record a series of questions and answers, including his objections. But it appears that his attention was called to his own question to the witness and the answer upon which the cross-examination was based. He stated he did not recall such a question. The reporter read his question, whereupon counsel for defendant stated: "Counsel was right. I withdraw my objection."

Other portions of the cross-examination upon the same subject were quoted in support of alleged error, but after his

statement we have quoted, no further objections were made by defendant's counsel to this line of examination. We must assume that in presenting the matter on appeal, defendant's counsel inadvertently overlooked the fact that his objection at the trial was withdrawn. The point was not made in defendant's motion for new trial, nor was it assigned as error on the appeal.

We find no reversible error in the record and the judgments will be affirmed.

Affirmed.

CAYTON, Associate Judge (dissenting).

Regretfully I note my dissent. I think there was serious and basic error in the refusal of the trial judge to submit the question of entrapment to the jury. To sanction that refusal would be to depart from the rule announced by our highest court in a number of recent cases; to depart also from the rule of public policy clearly announced in the federal courts and specifically to ignore the admonition of the United States Court of Appeals for this District "that courts are required to keep hands off the jury's business." Christie v. Callahan, 75 U.S.App.D.C. 133, 148, 124 F.2d 825, 840.

The judge's charge to the jury is of supreme importance in a criminal case. It is the last and most authoritative word the jury hears. It should stand as defendant's safeguard of fairness, impartiality and completeness. It must cover every defense made out by the evidence or reasonably deducible therefrom. Where there are several defenses there is no more justification for taking one defense from the jury than for directing a verdict of guilty on the whole case.

In this case, defendant asserted three principal defenses: (1) that the sales were made only on behalf of his wife; (2) that they were made in good faith, and (3) that he was entrapped into selling at a higher than legal price.

He was entitled to separate, specific instructions on each defense and to have the law concerning each carefully ex-

---

App.D.C. 223, 95 F.2d 352; United States v. Burroughs, 62 App.D.C. 163, 65 F.2d 796.

[9] "Instructions are required only on matters about which there is some issue to be presented to the jury." 23 C.J.

S., Criminal Law, § 1190; see also "Wharton's Criminal Pl. & Pr., 9th Ed. 712; Luttrell v. Commonwealth, 250 Ky. 334, 63 S.W.2d 292; West v. Butler's Ex'r, 248 Ky. 404, 58 S.W.2d 662; State v. Wilkinson, 76 Me. 317; King v. State, 71 Ala. 1.

plained to the jury.[1] And that, as our United States Court of Appeals has said, was his right whether he specifically requested it or not. Kinard v. United States, 68 App.D.C. 250, 96 F.2d 522, citing Kreiner v. United States, 2 Cir., 11 F.2d 722.

To the same effect are a number of cases, including State v. Decker, 321 Mo. 1163, 14 S.W.2d 617, 620, which held that defendant was entitled to instructions on the "law of the case" even though no specific instruction was offered at the trial. I think it but reasonable to hold that the principles just stated apply even more strongly to a special defense like that of entrapment which is distinct from the defense on the merits and is by way of avoidance.[2]

The majority cites no case—nor have I found one—holding a defendant not entitled to a separate instruction on entrapment, except where there was no evidence to support it. On the other hand the Federal and State cases are numerous which hold that when there is some evidence to support it, the defense of entrapment must be submitted to the jury. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249; Butts v. United States, 8 Cir., 273 F. 35, 18 A.L.R. 143; Di Salvo v. United States, 8 Cir., 2 F.2d 222; Capuano v. United States, 1 Cir., 9 F.2d 41; Silk v. United States, 8 Cir., 16 F.2d 568; Jarl v. United States, 8 Cir., 19 F.2d 891; People v. McCord, 76 Mich. 200, 42 N.W. 1106; Koscak v. State, 160 Wis. 255, 152 N.W. 181; State v. McKeehan, 48 Idaho 112, 279 P. 616. The rule is clearly stated in Falden v. Commonwealth, 167 Va. 549, 189 S.E. 329, 332, as follows:

"If there be conflict in the evidence as to whether the criminal intent originated in the mind of the accused or was induced or incited by the officer, then the solution of the question should be submitted to the jury."

In examining the evidence for this purpose we must be guided by the same rule which is applied in testing the sufficiency of evidence on a motion for a directed verdict. We are not to weigh it factually as a jury might do, but to determine whether it was "strong enough for us to allow the jury to consider it." Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825, 826. This court has several times been at pains, even in civil cases,[3] to point out—following Christie v. Callahan and the cases upon which it is based—that where there is any substantial evidence, however strong the denial, the decision must rest with the jury and not with the court. It is obvious that the rule applies even more strongly in criminal cases.

What then was the defendant's showing on the defense of entrapment? Among other things there was the testimony of Mrs. Sherman that Miller, the O.P.A. officer, told her "Yes, go ahead and sell them" and "Sell them for what you are now getting, $7\frac{1}{2}¢$;" that a little later she looked out front and saw Miller (seemingly noting license numbers of purchasers); that she walked out and asked him "What are you doing?" and he said, "Nothing." She said, "What are you taking names and writing things down here for?" "If we are going to have any trouble I would rather take my potatoes and dump them, dump them out, because I am not looking for any trouble." And he said, "No, I am not going to make you any trouble," "but the next thing I knew * * * he had a warrant out." (And this, in fact, Miller did. The sales took place on Friday, May 21st, around noon; and Miller swore out the warrant on the following Monday, May 24th.) They had stopped selling potatoes until he told them to "go ahead and sell for $7.50." One

---

[1] State, etc., Ins. Co. v. York, 4 Cir., 104 F.2d 730; Cincinnati, N. O. & T. P. R. Co. v. Francis, 187 Ky. 703, 220 S. W. 739; Dowdall v. Gilmore Oil Co., 18 Cal.App.2d 1, 62 P.2d 1051; McKinney v. Carson, 35 Utah 180, 99 P. 660; Memphis St. R. Co. v. Newman, 108 Tenn. 666, 69 S.W. 269; Mentz v. Omaha, etc., Ry. Co., 103 Neb. 216, 170 N.W. 889, 173 N.W. 478; People v. Egan, 331 Ill. 489, 163 N.E. 357; People v. Gallagher, 107 Cal.App. 425, 290 P. 504; Rowell v. Town of Vershire, 62 Vt. 405, 19 A. 990, 8 L.R.A. 708; Stapleton v. State, 56 Tex.Cr.R. 422, 120 S.W. 866; State v. Manns, 48 W. Va. 480, 37 S.E. 613; State v. Robichaux, 165 La. 497, 115 So. 728.

[2] Cf Morgan v. Commonwealth, 242 Ky. 116, 45 S.W.2d 850.

[3] Washington National Insurance Co. v. Stanton, D.C.Mun.App., 31 A.2d 680; Lohse v. Coffey, D.C.Mun.App., 32 A.2d 258; Viner v. Friedman, D.C.Mun.App., 33 A.2d 631; Birchall v. Capital Transit Co., D.C.Mun.App., 34 A.2d 624; Wright v. Capital Transit Co., D.C.Mun.App., 35 A.2d 183.

Crabill, a disinterested witness, corroborated this testimony in part. In addition there was the testimony of the defendant himself that Miller, after making several telephone calls to O.P.A. headquarters, and after making certain computations, told them to "go ahead and sell for $7.50." Defendant's witnesses made quite a strong showing that Miller took complete charge of the situation, and was the dominant figure throughout the transactions.

It must be remembered that potatoes were not contraband, and that defendant had a perfect right to sell all the potatoes he pleased, provided he kept the selling price within the legal ceiling. The selling price was of course the crux of the case and the basis of the prosecution. And, according to defendant, he completely submitted to the advice, interpretation, and instructions of Miller as to price. The showing fully justified the claim of the defendant that he was induced or lured or even *instructed* by Miller to sell for a price which later proved to be unlawful.

Did Miller know that $7.50 was an unlawful price? If so, why did he not so instruct the defendant or his wife, or both? What information did he get during that last telephone call to O.P.A. headquarters? What were the computations he made? Did he tell Sherman the truth, or did he withhold official information for the express purpose of betraying him? These were all matters that the jury was entitled to have explained by the judge in an instruction on entrapment. A mere general instruction would not do; and yet, not even such an instruction appears in the record. Of course I am not discussing Miller's denials because they are not involved on the question of granting or refusing the instruction. The question is whether there was *any* evidence upon which the prayer could have been based.

Can it be said that the evidence for the defense was incredible as a matter of law? Could the jury not reasonably have believed that Miller was illegally tricking the defendant when he computed the figures with him? Might they not reasonably have felt that he was perpetrating a deception when he announced after his last phone call to headquarters that $7.50 was the legal ceiling price? Was there not ample evidence to support defendant's version that Miller was busily preparing his criminal charges against the defendant while expressly disavowing any intention

of "making trouble" for him? In short, that Miller was himself violating the law and that his purpose was to "incite to and create crime for the sole purpose of prosecuting and punishing it." Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 213, 77 L.Ed. 413, 86 A.L.R. 249, quoting Judge Sanborn in Butts v. United States, 8 Cir., 273 F. 35, 18 A.L.R. 143.

Looking at the whole evidence, we behold a very strange situation. There was no effort to hide the potatoes for sale in secret, later on. There was no effort to deceive the O.P.A. officer as to the selling price. The sales were not made furtively, but under the very eyes of the O.P.A. officer, after repeated discussions and computations with him and with his full knowledge and approval. The sales were made in broad daylight,—all of the 100-pound sales on the public sidewalk. Two of the sales were made to Metropolitan Police Officers in full uniform. It seems to me that this was either a case of brazen, almost childish, defiance of the O.P.A. officer, or one of instigation, luring, deception, and entrapment by him. The defendant was entitled to have the jury say which it was. Taking that important issue from the jury resulted in a "chilling" of the defense, and was tantamount to a directed verdict against him. In my view it was clearly error.